[No. 2143-1. Division One. July 1, 1974.]

THE STATE OF WASHINGTON, *Respondent,* v. ARTHUR LEE SINCLAIR, *Appellant.*

*Cynthia S. Wills* and *Lish Whitson, Public Defenders,* for appellant (appointed counsel for appeal).

*Christopher T. Bayley, Prosecuting Attorney,* and *Jay A. Reich, Deputy,* for respondent.

HOROWITZ, J.—Defendant appeals his conviction on a charge of grand larceny after trial to the court.

Defendant's sole assignment of error is the denial of defendant's motion to suppress evidence, namely, a color television set, the subject matter of the grand larceny charged, and defendant's "statement" to the police officers concerning the set "while he was wrongfully detained" by those officers.

It is helpful to a later consideration of the contentions of the parties to now review the facts in detail. On August 14, 1972, about 12:30 in the afternoon, Seattle Police Officers Roy Burt and Dennis Ronning, while in their police car, saw a green Farwest station-wagon cab being driven in the Central Area of Seattle. In addition to the driver in the cab, there was a passenger, the later-charged defendant, and a large television set clearly visible in the back compartment of the cab. Officer Burt testified he knew "that color T.V.'s are very hot items for burglaries." Officer Burt had been assigned to this area for 4 years, and Officer Ronning for 2 years. The area was known to the police officers as a high

crime area in which a majority of burglaries in Seattle were committed. Both officers were then familiar with a Seattle Police Department memorandum issued confidentially to law enforcement personnel stating in substance that green taxicabs were being used to transport goods obtained by burglaries, and informing law enforcement personnel to be alert for suspicious merchandise transported in cabs generally. The officers followed the cab in their car. The cab pulled into an alley and stopped near defendant's home. The police stopped their car behind the cab.

When the cab came to a stop, the defendant left the cab. The officers recognized defendant from prior contact with him. Officer Ronning knew defendant both from direct contact and from information received from other police officers who had questioned defendant when he was under suspicion for other crimes, including larcenies and burglaries. Officer Burt first met defendant 3 or 4 years before while investigating a robbery. In the course of his criminal investigation duties, he also had had other contact with defendant as a juvenile and as an adult. Officer Burt had given defendant a traffic citation on July 20, 1972. Only a week before this latest stop, the officer had learned the citation had not been cleared. He suspected there might be a traffic warrant outstanding for defendant's arrest.

After the cab came to a stop, defendant looked toward the police. Officer Burt testified:

> He had a very strange surprised look at that time. He hurriedly started to say something to the driver and then real quick jerked back and started towards a particular house back there.

The officers knew the house was defendant's residence. Officer Burt called for defendant to "wait a minute," and defendant returned to the vicinity of the cab. The officer took defendant to the police car and put him inside for questioning. At precisely what point this occurred is not clear.

Officer Burt asked the defendant for identification and age for checking purposes, including a check on the possibility of there being an outstanding bench warrant on the traffic citation. Defendant was unable to produce any proper identification and refused to give his age.

The officers also questioned defendant about the television set. Defendant explained he had just purchased it that morning for $55. He was unable to produce the sales slip or receipt for the purchase price, but he identified the seller as one Ronald Hall and gave two addresses for him. Officer Ronning left the car to look at the television set. He could see while outside the cab it was a color television set and "quite valuable." With the assistance of the cab driver, he ascertained the set's serial numbers either while the set was in the cab or after it was removed and placed outside the cab. At that time the officers had no knowledge the set had been stolen. Defendant appeared nervous and excited while answering questions. The officers then learned from a quick radio check to police headquarters that the television set had not been reported stolen, that there was an outstanding warrant for defendant's arrest, and that one address (according to Officer Burt), or both addresses (according to Officer Ronning), given for the seller were nonexistent.

Upon receipt of the information from police headquarters, defendant was arrested and, according to Officer Burt, told he was "under arrest for the traffic warrant and for all intents and purposes for grand larceny." According to Officer Ronning, defendant was told that he was under arrest "for possibly burglary or larceny besides the warrant." About this time several persons, including defendant's aunt, had arrived at the scene and were berating the police and calling them names. Defendant, following the arrest, requested the police to leave the television set with his aunt at his home. The police refused. Instead, they seized it to take it down to police headquarters. As Officer Ronning testified, "Well, being suspicious that it may be

stolen, we wanted to keep it in our custody until we investigated the matter further." Following the arrest, defendant was warned of his constitutional rights, *i.e.*, the so-called *Miranda* rights.

After arriving at the police station, defendant told Officer Ronning that he had not told the officers the truth about how he had obtained the set. Defendant stated that he had met one "Robert" in an alley behind 400 Summit East; that he paid him $50, and then later he said $55, for the set; that the seller had told him he was going to get out of town, that he was wanted for something and that he had to sell this television. Defendant said he was not told Robert's last name. Robert informed defendant the set was hidden in a large dumpster in the area where he met Robert. On August 15, 1972, defendant was interviewed by Detective Ferguson of the Seattle Police Department. Defendant was again advised of his constitutional rights and thereafter gave a written statement similar to the statement he had earlier given to Officer Ronning. The set was later found to be stolen and defendant was charged with grand larceny.

Prior to trial, defendant made a motion to suppress the television set and "a statement made by defendant with regard to this television." At the hearing on the motion, the parties agreed the court could reserve ruling thereon pending trial. Following trial, the court found defendant guilty as charged, entered detailed findings and conclusions, including a conclusion denying defendant's motion to suppress evidence. Certain of such conclusions are set out in the margin.[1] The court apparently treated the scope of the

---

[1]The conclusions include the following:

"IV

"That the 'initial' statements of the defendant were made in the investigatory stage and were not made while the defendant was in custody and/or deprived of his freedom of action;

"V

"That the remaining statements, both written and oral, were made after his arrest and after he had been fully and property [*sic*] advised of his constitutional rights.

motion as including the statements made after defendant arrived at the police station.

Defendant on appeal contends the court erred in denying his motion to suppress. He argues his detention and questioning by police constituted an illegal arrest made without probable cause; that defendant's answers to police interrogation were inadmissible because given prior to *Miranda* warnings; and that the television set was illegally seized without probable cause in violation of the Fourth Amendment. We do not agree with defendant and affirm.

▪ In the disposition of the issues raised, it is useful to consider the principles applicable from the perspective of these and related rules of law. A police officer, in the discharge of his routine law enforcement duties prior to having probable cause to believe that a person he seeks to question has committed a crime for which an arrest may be made, may detain and question that suspect concerning his knowledge of the commission of a crime, including one in process of being committed or about to be committed, without the detention or questioning being considered an arrest and without the necessity of the police officer first giving the person questioned *Miranda* warnings. *Adams v. Williams*, 407 U.S. 143, 32 L. Ed. 2d 612, 92 S. Ct. 1921 (1972); *Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968); *Slate v. Gluck*, 83 Wn.2d 424, 518 P.2d 703 (1974); *State v. Smith*, 9 Wn. App. 279, 511 P.2d 1032 (1973); *State v. Haverty*, 3 Wn. App. 495, 475 P.2d 887 (1970). It follows in principle that no arrest takes place when a police officer

---

"VI

"That all of the statements of the defendant were made freely and voluntarily;

"VII

"That the officers acted reasonably under the circumstances

"VIII

"That the officers conduct was not arbitrary nor was it indicative of any part of harassment;

"IX

"That the motion to suppress the evidence is hereby denied since the evidence was not the product of an unlawful search and seizure;"

makes an investigatory stop and detention of a person he reasonably suspects has an arrest warrant outstanding against him.

In *State v. Gluck, supra* at 426, the court, in upholding the validity of an investigatory stop of persons riding in a car suspected of being involved in a crime, said:

> The stopping of vehicles for traffic or general investigation has been specifically held to be noncustodial in nature. . . . It has also been held that traffic enforcement officers may stop motorists for routine checks, and such stopping does not amount to an arrest or unlawful stopping. . . . It follows, therefore, that where officers entertain a well-founded suspicion not amounting to probable cause, they may stop the suspected person, identify themselves and require the suspect to identify himself and explain his activity without being adjudged to have made a formal arrest. . . .

If the officer reasonably suspects from particular facts the person stopped for questioning is armed—a mere hunch being insufficient—he may conduct a pat-down search of the suspect to ascertain whether he is armed and, if he is, to remove the weapon. The suspicion need not reach the level of probable cause for arrest. *Terry v. Ohio, supra*; J. Cook, *Constitutional Rights of the Accused: Pretrial Rights* § 17, at 129 (1972).

An officer, following a lawful investigatory stop and detention based on "a well-founded suspicion not amounting to probable cause" to arrest, may reasonably wish to check the suspect's answers to investigatory questions. He may be able to do this by questioning other persons present, or by police headquarters radio check. Because the investigation is still in progress, the officer may temporarily detain a suspect pending the receipt of results of the police headquarters radio check. *State v. Kerens*, 9 Wn. App. 449, 513 P.2d 63 (1973), upheld the right of police officers to conduct a police headquarters radio check of a suspect whom they had probable cause to believe had committed a misdemeanor in their presence. In principle, a brief detention of

a suspect during the investigatory stage, pending a police headquarters radio check in the course of that investigation, does not violate the Fourth Amendment if the officer has reasonable cause to believe from the information obtained from the suspect that such a check is necessary. In the exercise of reasonable judgment so to do, he may rely upon the information received in determining whether there is probable cause for arrest or further search or seizure. As J. Cook, *supra* at 131, states:

> [T]he suspect may himself reveal evidence which provides probable cause to arrest. . . . [T]he suspect may, by virtue of his own incriminating statements, provide the probable cause to justify his arrest.

During the investigatory stage, before the level of probable cause is reached to arrest the suspect or to seize objects on his person or under his control, even if the objects be found in the course of a warrantless search of his automobile, such objects may not be taken into police custody for purposes of further investigation. On the other hand, if the level of probable cause has been reached, the rule is otherwise under the doctrine of plain view. *Chambers v. Maroney*, 399 U.S. 42, 26 L. Ed. 2d 419, 90 S. Ct. 1975 (1970); *Sibron v. New York*, 392 U.S. 40, 20 L. Ed. 2d 917, 88 S. Ct. 1889 (1968); *State v. Helms*, 77 Wn.2d 89, 459 P.2d 392 (1969); *State v. Day*, 7 Wn. App. 965, 503 P.2d 1098 (1972); *State v. Larsen*, 4 Wn. App. 356, 481 P.2d 462 (1971). This rule is in contrast with the rule that permits a full search incident to a lawful arrest. *United States v. Robinson*, 414 U.S. 218, 38 L. Ed. 2d 427, 94 S. Ct. 467 (1973).

The foregoing principles support the action of the police in stopping, detaining and questioning defendant, and making a police headquarters check on the information obtained, all before probable cause to arrest existed. It should be emphasized, however, that the "well-founded suspicion" relied upon in this case did not arise until the defendant was recognized as a person whom the officers had reasonable grounds to suspect had a traffic warrant outstanding

against him. They did not stop the cab; they merely followed it until it stopped. They then recognized defendant. Based upon the suspicion described, the officers were justified in temporarily detaining defendant pending radio confirmation of the warrant and his answers to their investigatory questions. Upon receiving radio confirmation of the outstanding warrant, the officers had probable cause to arrest defendant on the warrant charge and, as next discussed, the grand larceny charge as well.

■ *State v. Gluck, supra* at 426-27, defines probable cause as follows:

> Probable cause exists where the facts and circumstances within the arresting officer's knowledge and of which he has reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in a belief that an offense has been or is being committed.

In determining whether probable cause exists, the police may rely upon the totality of known suspicious circumstances. *State v. Parker,* 79 Wn.2d 326, 485 P.2d 60 (1971); *State v. Smith,* 9 Wn. App. 309, 511 P.2d 1390 (1973); J. Cook, *supra* at 98 n.22. These circumstances need not be sufficient to prove a suspect's guilt of the crime involved beyond a reasonable doubt. *State v. Parker, supra* at 328; *State v. Bellows,* 72 Wn.2d 264, 432 P.2d 654 (1967); J. Cook, *supra* at 99. Furthermore, the circumstances may be those which the police officers, in light of their experience and expertise, identify as indicating criminal behavior even though those circumstances might not so appear to a judge or layman. *State v. Cabigas,* 5 Wn. App. 183, 486 P.2d 1139 (1971); J. Cook, *supra* at 100-01.

■ The circumstances relevant here to the issue of probable cause include (1) information from police headquarters concerning the modus operandi used in the commission of like crimes; (2) the use by the suspect of the reported modus operandi; (3) the giving of false answers to police questions concerning the lawfulness of his possession of the television set found with him; (4) prior police contacts with defendant; (5) the great number of burglaries

committed in the area in which defendant was stopped (*see, e.g., Adams v. Williams, supra; Jenkins v. United States,* 284 A.2d 460 (D.C. Ct. App. 1971); *State v. Gluck, supra* ); (6) the low price paid for a color television set the officer believed to be "quite valuable." *See generally* J. Cook, *supra* at 103-04, 110-12, 120-21. The police may lawfully seize personal property having probable cause to believe it was stolen even if no report of the theft has been received. *Jenkins v. United States, supra.*

The set was inadvertently seen in the green station-wagon cab by the officers while they were driving. Investigation during a proper investigatory stop showed circumstances above discussed adding up to probable cause to believe the set was stolen. Seizure was justified under the doctrine of plain view. It is true Officer Ronning testified that "being suspicious that it may be stolen, we wanted to keep it in our custody until we investigated the matter further." His testimony is consistent with the existence of probable cause based on the circumstances reviewed. If probable cause exists, the seizure may be upheld even if the officer making the seizure subjectively relied upon an inadequate legal reason for doing so. *See State v. Day, supra* at 969.

It is possibly true also the set was seized while defendant was seated in the police officers' automobile and hence he had no access to the set. That fact raises the question whether the set could be lawfully seized under the search incident test. *State v. Jones,* 2 Wn. App. 627, 472 P.2d 402 (1970). The plain view test being sufficient to justify the seizure, we need not decide whether the search incident test would also uphold that seizure. *See State v. Palmer,* 5 Wn. App. 405, 487 P.2d 627 (1971).

The State also defends the seizure here because "the police confiscated the television to protect it, and indeed to protect themselves from liability," citing the analogy of the car impoundment case of *State v. Montague,* 73 Wn.2d 381, 438 P.2d 571 (1968). *Montague* involved a car impound-

ment after a lawful arrest on probable cause, followed by an inventory of the contents of the car. If the State's argument is one intended to support a seizure when there is an absence of probable cause, it may be doubted if the argument is supportable. *See Daugherty v. United States,* 272 A.2d 675 (D.C. Ct. App. 1971). Having found that probable cause to arrest the defendant for the crime charged exists here, it is unnecessary to further consider whether the seizure would be supportable if probable cause was absent.

Affirmed.

JAMES and WILLIAMS, JJ., concur.