[No. 6280–1.   Division One.   September 24, 1979.]

THE STATE OF WASHINGTON, *Respondent*, v. MACK HARRIS THOMPSON, *Appellant*.

---

*Robert Olson* and *David A. Middaugh* of *Seattle–King County Public Defender Association,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Lee Ann Miller, Deputy,* for respondent.

WILLIAMS, J.—Mack Harris Thompson appeals from a judgment entered upon his conviction in a trial to the court sitting without a jury of possession of heroin in violation of

the Uniform Controlled Substances Act, RCW 69.50.401(c). He contends that certain evidence seized during a police investigation should have been suppressed. We affirm.

The facts are these: About noon on April 22, 1977, State Patrol Trooper Gary Jacobson was told by radio of a report that an occupant of an automobile heading north on Interstate 5 in King County was waving a handgun. The license number and description of the car were given. Shortly thereafter, the officer saw the described vehicle and followed it from the highway into the Southcenter parking lot. Then, according to the officer, the vehicle "meandered" rather slowly through the parking lot, finally parking immediately next to a car which was the only one in the vicinity for several hundred feet.

The officer stopped behind the car he had been following and ordered the occupants to step out with their hands in view, which they did. Thereupon, Thompson, who had been sitting in the driver's seat of the parked car, got out and started to walk rapidly past the officer who told him to remain.

Within a minute or two other police officers arrived. One asked Thompson to identify himself, which he did, and the information was radioed to headquarters. Soon,[1] information was returned that there was a $39 traffic warrant outstanding for Thompson. He was then arrested and searched. Because contraband was discovered, his car was impounded, and an inventory search produced more contraband.

▇ Thompson contends that Officer Jacobson illegally detained him; that if the officer had not done so and had not made the arrest on the traffic warrant, the contraband would not have been discovered. The officer was investigating a serious situation. There was the report of the pistol

---

[1]One officer said that the time between the stop and the return call from headquarters was "within the period of less than 5 minutes." Another officer said that Thompson was held without any action being taken for "approximately 15 minutes or so." The trial court observed that "it was a brief detention."

being brandished, the suspicious "homing" of the car upon the other in an isolated part of the parking lot and Thompson's rapidly walking away from his car. Because of these circumstances further investigation was called for, but while waiting for help, the officer needed to take measures to protect himself which he did. An officer has the right to search out and neutralize persons in the vicinity who might be a threat to his safety. *State v. Toliver*, 5 Wn. App. 321, 487 P.2d 264 (1971).

█ Upon the arrival of other police officers, the investigation continued. Thompson was detained for identification and a radio check which was reasonable. *State v. Gluck*, 83 Wn.2d 424, 518 P.2d 703 (1974); *State v. Clark*, 13 Wn. App. 21, 533 P.2d 387, *review denied*, 85 Wn.2d 1018 (1975); *State v. Davis*, 12 Wn. App. 32, 527 P.2d 1131 (1974). Citing *State v. Gluck, supra*, this court in *State v. Sinclair*, 11 Wn. App. 523, 529, 523 P.2d 1209 (1974) said:

> An officer, following a lawful investigatory stop and detention based on "a well–founded suspicion not amounting to probable cause" to arrest, may reasonably wish to check the suspect's answers to investigatory questions. He may be able to do this by questioning other persons present, or by police headquarters radio check. Because the investigation is still in progress, the officer may temporarily detain a suspect pending the receipt of results of the police headquarters radio check.

When the information concerning the traffic warrant was received, the police had full authority to arrest Thompson. The search incident to the arrest followed. *State v. Smith*, 88 Wn.2d 127, 138, 559 P.2d 970, *cert. denied*, 434 U.S. 876, 54 L. Ed. 2d 155, 98 S. Ct. 226 (1977).

█ Thompson complains that by his own testimony, Officer Jacobson did not have a reasonable suspicion, only an "instinct." The officer's testimony is that:

> I had a suspicious circumstance. Call it instinct or whatever. Something told me that I should keep this gentleman long enough to I.D. him.

Call it instinct, intuition, hunch, sixth sense, or whatever, there was reason for a trained police officer to believe that something untoward was afoot. As the trial court remarked:

> It was a brief detention, to say under these circumstances that a law enforcement officer, who is alone, in view of the knowledge that he had, can't request a citizen to remain in the vicinity until such time as he can properly investigate it, I think would be ignoring reality.

*Brown v. Texas,* 443 U.S. 47, 61 L. Ed. 2d 357, 99 S. Ct. 2637 (1979) should be mentioned. There, police officers saw defendant Brown and another man walk away from one another in an area with a high incidence of drug traffic. Because the situation "looked suspicious" and Brown had not been seen in that vicinity before, he was asked for identification which he refused to give. He was then arrested under a criminal statute requiring that a person must give his name and address to an officer "who has lawfully stopped him and requested the information." In deciding that this application of the statute violated the Fourth Amendment, the Supreme Court said in *Brown v. Texas, supra* at 52:

> In the absence of any basis for suspecting appellant of misconduct, the balance between the public interest and appellant's right to personal security and privacy tilts in favor of freedom from police interference. The Texas statute under which appellant was stopped and required to identify himself is designed to advance a weighty social objective in large metropolitan centers: prevention of crime. But even assuming that purpose is served to some degree by stopping and demanding identification from an individual without any specific basis for believing he is involved in criminal activity, the guarantees of the Fourth Amendment do not allow it. When such a stop is not based on objective criteria, the risk of arbitrary and abusive police practices exceeds tolerable limits.

In this case, as seen, objective criteria were present.

Thompson also contends that the impoundment and subsequent inventory search of his automobile by police officers violated the Fourth Amendment. The police

impounded Thompson's car at the Southcenter parking lot and removed it to the Tukwila City garage, although Thompson informed the police that the car was not his and that the owner would come and pick it up. An officer then conducted an inventory search discovering narcotics and narcotics paraphernalia.

A good faith inventory search, incident to a lawful impoundment, is not violative of the Fourth Amendment. *State v. Montague,* 73 Wn.2d 381, 438 P.2d 571 (1968). To be lawful, the impoundment must be authorized by statute or ordinance or there must be reasonable cause for the impoundment. *State v. Singleton,* 9 Wn. App. 327, 511 P.2d 1396 (1973). The State carries the burden of proving that an impoundment is reasonable and that no reasonable alternative to impoundment exists. *State v. Hardman,* 17 Wn. App. 910, 567 P.2d 238 (1977), *review denied,* 89 Wn.2d 1020 (1978).

The inventory search, itself, must be conducted in good faith and for a proper purpose. As was said in *State v. Gluck, supra* at 428:

> we have also insisted that they be conducted in good faith for the purposes of (1) finding, listing, and securing from loss during detention, property belonging to a detained person, (2) protecting police from liability due to dishonest claims of theft, and (3) protecting temporary storage bailees against false charges.

In this case, impoundment of Thompson's vehicle was reasonable. Contraband was found on Thompson's person during a search incident to his arrest and the police reasonably believed his vehicle might also contain contraband. There were no reasonable alternatives to impoundment. The police wished to secure the vehicle in order to obtain a search warrant. They could not release the car to its owner or any other person for fear the third party would destroy the evidence, purposely or inadvertently. The officer in charge of the arrest testified that he did not have enough personnel to assign an officer to guard the car at the scene. The impoundment was proper.

Once impounded, the police properly inventoried the vehicle. The inventory was conducted in good faith and was not a mere pretext for a general search. *State v. Montague, supra.* The police were entitled to inventory the car to protect themselves against false claims of missing property.

The judgment is affirmed.

ANDERSEN, J., concurs.

RINGOLD, J. (dissenting)—The majority opinion passes lightly over the threshold question that must be met before the search of the defendant's overcoat and vehicle may be sustained—was the initial detention of the defendant consistent with Fourth Amendment standards? *Terry v. Ohio,* 392 U.S. 1, 16, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968), teaches that "whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." To justify such an interference with a person's liberty the police officer must be able to point to articulable facts which justify intrusion and when judged later the facts which are articulated must be such as to warrant a man of reasonable caution to conclude that the intrusion was appropriate. The court stated it thus at pages 21–22:

> [I]t is imperative that the facts be judged against an objective standard: would the facts available to the officer . . . "warrant a man of reasonable caution in the belief" that the action taken was appropriate? . . . Anything less would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches, a result this Court has consistently refused to sanction.

We thus must determine whether, absent probable cause to arrest, a person who leaves a vehicle not implicated with the conduct justifying the detention of another vehicle may be seized and searched, not because the officer had any fear for his safety from that person, but solely because the officer had a "suspicious circumstance." The majority opinion characterizes an "instinct, intuition, hunch, sixth sense or

whatever" of the officer as such a "suspicious circumstance."

Since *Terry v. Ohio, supra,* United States courts have struggled to define and rationalize the principles under which an investigatory stop of an individual may comport with Fourth Amendment guaranties against unreasonable searches and seizures. Our own state court in a line of cases commencing with *State v. Gluck,* 83 Wn.2d 424, 426, 518 P.2d 703 (1974) has said:

> [W]here officers entertain a well–founded suspicion not amounting to probable cause, they may stop the suspected person, identify themselves and require the suspect to identify himself and explain his activity without being adjudged to have made a formal arrest.

The test of the validity of such a brief detention is whether it appears in the totality of the circumstances that the detention was based upon reasonable grounds and was not arbitrary or harassing. *State v. Byers,* 85 Wn.2d 783, 539 P.2d 833 (1975), *rev'd on other grounds,* 88 Wn.2d 1, 559 P.2d 1334 (1977), *State v. Larson,* 21 Wn. App. 506, 587 P.2d 171 (1978). The State has the burden of showing that the detention was reasonable. *State v. Davis,* 12 Wn. App. 32, 527 P.2d 1131 (1974). Further, in *State v. Serrano,* 14 Wn. App. 462, 465–66, 544 P.2d 101 (1975), we observed:

> In considering the legality of this stop, we are not unmindful that the Fourth Amendment, in providing that "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, . . ." is intended to assure the privacy and security of individuals against arbitrary invasions by officials of government. . . . Balanced against this is the public's interest in effective police protection that will justify certain kinds of warrantless searches and intrusions against the person. . . . Within the constitutional mandate, it is beyond question that "the right to stop, question and detain is vital to the detection of crime in our modern urban communities . . ." *United States v. Thomas,* 250 F. Supp. 771, 790 (S.D.N.Y. 1966). A temporary detention is justifiable under suspicious circumstances, to

enable the policeman to determine whether to make an arrest, investigate further, or take no action if satisfied with the explanation given.

The United States Supreme Court in the spring 1979 term has now drawn the line. In three opinions the Supreme Court has laid down the rules which in my view mandate reversal here.

In *Delaware v. Prouse,* 440 U.S. 648, 59 L. Ed. 2d 660, 99 S. Ct. 1391 (1979), the State of Delaware urged that discretionary spot checks are reasonable under the Fourth Amendment because the state's interest in the practice as a means of promoting public safety upon its roads more than outweighs the intrusion. The Supreme Court distinguished *Prouse* from *United States v. Martinez–Fuerte,* 428 U.S. 543, 49 L. Ed. 2d 1116, 96 S. Ct. 3074 (1976), in which the Supreme Court ruled as valid checkpoint stops, saying:

> Recognizing that the governmental interest involved was the same as that furthered by roving patrol stops, the Court nonetheless sustained the constitutionality of the border patrol's checkpoint operations. The crucial distinction was the lesser intrusion upon the motorists' Fourth Amendment interests:

*Delaware v. Prouse, supra* at 656. Mr. Justice White delivered the opinion of the court to which only Justice Rehnquist dissented. The court emphasized the "grave danger" of unbridled discretion, the absence of which was the touchstone of the validity of the checkpoint stops in *United States v. Martinez–Fuerte, supra.*

In the second case, *Dunaway v. New York,* 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248 (1979), the proprietor of a pizza parlor in Rochester, New York, was killed during an attempted robbery. Without enough information to get a warrant, detectives picked up the defendant and placed him in custody. Although he was not told he was under arrest, he would have been physically restrained had he attempted to leave. He was questioned by officers after being given warnings required by *Miranda* and eventually made statements and sketches which incriminated him.

The issue finally came to the Supreme Court on the question whether the Rochester police violated the Fourth and Fourteenth Amendments when without probable cause to arrest they took petitioner into custody, transported him to the police station and detained him there for interrogation.

The court then construed *Terry v. Ohio, supra,* as follows:

> Before *Terry v. Ohio,* 392 U. S. 1 (1968), the Fourth Amendment's guarantee against unreasonable seizures of persons was analyzed in terms of arrest, probable cause for arrest, and warrants based on such probable cause. The basic principles were relatively simple and straightforward: The term "arrest" was synonymous with those seizures governed by the Fourth Amendment. While warrants were not required in all circumstances, the requirement of probable cause, as elaborated in numerous precedents, was treated as absolute. The "long–prevailing standards" of probable cause embodied "the best compromise that has been found for accommodating [the] often opposing interests" in "safeguard[ing] citizens from rash and unreasonable interferences with privacy" and in "seek[ing] to give fair leeway for enforcing the law in the community's protection." *Brinegar v. United States,* 338 U. S. 160, 176 [93 L. Ed. 1879, 69 S. Ct. 1302] (1949). The standard of probable cause thus represented the accumulated wisdom of precedent and experience as to the minimum justification necessary to make the kind of intrusion involved in an arrest "reasonable" under the Fourth Amendment. The standard applied to all arrests, without the need to "balance" the interests and circumstances involved in particular situations. Cf. *Camara v. Municipal Court,* 387 U. S. 523 [18 L. Ed. 2d 930, 87 S. Ct. 1727] (1967).
>
> *Terry* for the first time recognized an exception to the requirement that Fourth Amendment seizures of persons must be based on probable cause. That case involved a brief, on–the–spot stop on the street and a frisk for weapons, a situation that did not fit comfortably within the traditional concept of an "arrest." Nevertheless, the Court held that even this type of "necessarily swift action predicated upon the on–the–spot observations of the officer on the beat" constituted a "serious intrusion upon the sanctity of the person, which may inflict great indignity

and arouse strong resentment," 392 U. S., at 20, 17, and therefore "must be tested by the Fourth Amendment's general proscription against unreasonable searches and seizures." *Id.,* at 20. However, since the intrusion involved in a "stop and frisk" was so much less severe than that involved in traditional "arrests," the Court declined to stretch the concept of "arrest"—and the general rule requiring probable cause to make arrests "reasonable" under the Fourth Amendment—to cover such intrusions. Instead, the Court treated the stop and frisk intrusion as a *sui generis* "rubric of police conduct," *Ibid.* And to determine the justification necessary to make this specially limited intrusion "reasonable" under the Fourth Amendment, the Court balanced the limited violation of individual privacy involved against the opposing interests in crime prevention and detection and in the police officer's safety. *Id.,* at 22–27. As a consequence, the Court established "a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." *Id.,* at 27. Thus, *Terry* departed from traditional Fourth Amendment analysis in two respects. First, it defined a special category of Fourth Amendment "seizures" so substantially less intrusive than arrests that the general rule requiring probable cause to make Fourth Amendment "seizures" reasonable could be replaced by a balancing test. Second, the application of this balancing test led the Court to approve this narrowly defined less intrusive seizure on grounds less rigorous than probable cause, but only for the purpose of a pat–down for weapons.

Because *Terry* involved an exception to the general rule requiring probable cause, this Court has been careful to maintain its narrow scope. *Terry* itself involved a limited, on–the–street frisk for weapons. Two subsequent cases which applied *Terry* also involved limited weapons frisks. See *Adams v. Williams,* 407 U. S. 143 [32 L. Ed. 2d 612, 92 S. Ct. 1921] (1972) (frisk for weapons on basis of reasonable suspicion); *Pennsylvania v. Mimms,* 434 U. S. 106 [54 L. Ed. 2d 331, 98 S. Ct. 330] (1977) (order to get out of car is permissible "de minimis" intrusion after car is lawfully detained for traffic violations; frisk for

weapons justified after "bulge" observed in jacket). *United States v. Brignoni–Ponce,* 422 U. S. 873 [45 L. Ed. 2d 607, 95 S. Ct. 2574] (1975), applied *Terry* in the special context of roving border patrols stopping automobiles to check for illegal immigrants. The investigative stops usually consumed less than a minute and involved "a brief question or two." 422 U. S., at 880. The Court stated that "[b]ecause of the limited nature of the intrusion, stops of this sort may be justified on facts that do not amount to the probable cause required for an arrest." *Ibid.* See also *United States v. Martinez–Fuerte,* 428 U. S. 543 (1976) (fixed checkpoint to stop and check vehicles for aliens); *Delaware v. Prouse,* 440 U. S. 648 (1979) (random checks for drivers' licenses and proper vehicle registration not permitted on less than articulable reasonable suspicion).

(Footnotes omitted.) *Dunaway v. New York, supra* at 207–11.

In *Brown v. Texas,* 443 U.S. 47, 61 L. Ed. 2d 357, 99 S. Ct. 2637 ( 1979) a case indistinguishable from the facts here, a unanimous court found Fourth Amendment violations. The defendant was convicted for refusing to comply with a policeman's demand that he identify himself pursuant to a provision of a Texas penal code which makes it a crime to refuse the identification upon request. Officers were cruising in a patrol car. They observed defendant and another man walking away from one another in an alley. One of the officers testified that although they were a few feet apart when first seen, he had observed them together or about to leave when the patrol approached. The officer further testified that he stopped the defendant because the situation "looked suspicious and we had never seen that subject in the area before." The area of El Paso where defendant was stopped has a high incidence of drug traffic. The officers did not claim to suspect the defendant of any specific misconduct nor did they have any reason to believe Brown was armed. Mr. Chief Justice Burger stated at page 50: "When the officers detained appellant for the purpose of requiring him to identify himself, they performed a seizure of his person subject to the requirements of the Fourth

Amendment." Mr. Chief Justice Burger emphasized the necessity of objective facts possessed by the officers which would then give them reasonable suspicions justifying a seizure less intrusive than a traditional arrest. He stated:

> A central concern in balancing these competing considerations in a variety of settings has been to assure that an individual's reasonable expectation of privacy is not subject to arbitrary invasions solely at the unfettered discretion of officers in the field. See *Delaware v. Prouse,* 440 U. S. 648, 654–655 (1979); *United States v. Brignoni–Ponce, supra,* at 882. To this end, the Fourth Amendment requires that a seizure must be based on specific, objective facts indicating that society's legitimate interests require the seizure of the particular individual, or that the seizure must be carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers. *Delaware v. Prouse, supra,* at 663. See *United States v. Martinez–Fuerte,* 428 U. S. 543, 558–562 (1976).
>
> . . .
>
> The flaw in the State's case is that none of the circumstances preceding the officers' detention of appellant justified a reasonable suspicion that he was involved in criminal conduct. . . .
>
> In the absence of any basis for suspecting appellant of misconduct, the balance between the public interest and appellant's right to personal security and privacy tilts in favor of freedom from police interference. . . . When such a stop is not based on objective criteria, the risk of arbitrary and abusive police practices exceeds tolerable limits. See *Delaware v. Prouse, supra,* at 661.

*Brown v. Texas, supra* at 51–52.

Of key importance in this inquiry is that there be specific objective facts upon which the officer's reasonable suspicions be based; any other basis invites detention "solely at the unfettered discretion of officers in the field."

The majority opinion points to a pistol being brandished, the "homing" of the car upon the other in an isolated part of the lot, and Thompson's rapidly walking away from his car. These are the only objective facts upon which any reasonable suspicion could be based. It is important to note

that the brandishment of the pistol was in the car being followed by the police, not in Thompson's car. Thus, that fact is wholly immaterial to any reasonable suspicion that Thompson had been involved in criminal activity, or was carrying a weapon. The facts that the car being followed parked next to his and that he rapidly left the area do not amount to a reasonable suspicion.

In my view it was occasioned by the officer's subjective views in exercising his unbridled discretion.

At the 3.5 hearing the following colloquy took place:

Q . . . Why did you ask Mr. Thompson to stop . . .?
A All that I can say is that I had a suspicious circumstance. Call it instinct or whatever. Something told me that I should keep this gentleman long enough to I.D. him. At that time things happened very quickly. And I'm really not totally sure what went through my mind. It's just that I was—I think an instinct is a fair statement.
Q Is that instinct based on the fact that he happened to be black and the two subjects that you were concerned with were in fact black?
A That certainly had something to do with it, yes—the fact that we had three black subjects together.

It is not a rhetorical question to ask whether the trooper would have detained a Caucasian shopper leaving the Chrysler.

The detention here was based upon a subjective rather than objective standard. This is *precisely* the reason the United States Supreme Court has insisted upon objective standards.

I respectfully dissent.

Reconsideration denied November 6, 1979.

Review granted by Supreme Court February 15, 1980.