FILED
COURT OF APPEALS DIV I
STATE OF WASHINGTON

2018 SEP -4 AM 9: 30

**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 76506-0-I |
| Appellant, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | PUBLISHED OPINION |
| MARK WADE ALEXANDER, JR., | ) | |
| | ) | |
| Respondent. | ) | FILED: September 4, 2018 |
| | ) | |

LEACH, J. — The State appeals the trial court's decision to suppress evidence of no-contact orders discovered by police during a Terry[1] stop. The State challenges the court's findings and conclusions related to the scope of the Terry stop. Because we agree that the investigating officer did not exceed the scope of the Terry stop, we reverse and remand.

FACTS

On October 24, 2016, at about 6:44 p.m., a motorist driving on Aurora Avenue called 911. The motorist identified herself and reported that she saw a man punch a woman at North 85th Street and Aurora Avenue North. She described the man as a white male, 20 to 30 years old, thin, wearing a baseball cap and a red hooded sweatshirt. She described the victim as a white female, 20

---

[1] Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

to 30 years old, five feet seven, slender, with long, dark, curly hair in a ponytail, wearing a red sweatshirt with plaid pajama pants. She reported they were traveling northbound.

A dispatcher relayed the information provided by the 911 caller to Officer Nathan Lemberg. Officer Lemberg saw a man and woman matching this information walking northbound near 88th and Aurora. After following them for a short while, he stopped them. When he first saw them, they were walking and talking together. When Officer Lemberg started to follow them, the man began to walk in front of the woman.

Officer Lemberg saw no assault or struggle between the man and the woman. He pulled his car off the road and detained the man and woman.

The man identified himself as Mark Alexander. The man admitted to getting "into the face of the woman" and arguing with her but denied assaulting her. He also denied having any relationship with the woman. Officer Lemberg ran the name through the law enforcement database. The search confirmed Alexander's identity. The search revealed no outstanding warrants but did reveal two active domestic violence no-contact orders. The orders prohibited Alexander from contacting a person named Danyail Carlson.

At that time, Officer Lemberg did not know the identity of the woman with Alexander. While Officer Lemberg searched the law enforcement database, the

other officers spoke to the woman. She denied that she had been assaulted. When the officers asked her name, she gave a false name. Almost immediately, the officers discovered this after learning the woman's true identity as Carlson by looking at a booking photo.

Officer Lemberg arrested Alexander for violating the domestic violence no-contact orders. The State charged Alexander with domestic violence felony violation of a court order. Alexander asked the court to suppress evidence of the no-contact orders, claiming that Officer Lemberg did not have the required reasonable suspicion needed to justify the initial stop.

After a joint CrR 3.5/3.6 hearing, the trial court suppressed the no-contact orders on a different ground. It found that Officer Lemberg was justified in detaining Alexander but exceeded the scope of the initial Terry stop when (1) he ran Alexander's name through a law enforcement database and (2) he conducted a second round of questioning of the woman about her identity and the no-contact orders.

The State appeals.

ANALYSIS

The State challenges one of the trial court's findings of fact and two conclusions of law. When reviewing a trial court's suppression decision, this court examines whether substantial evidence supports the challenged findings

-3-

and whether those findings support the conclusions of law.[2]  Substantial evidence is enough evidence to persuade a fair-minded person of the truth of the finding.[3]  This court treats unchallenged findings as true for purposes of the appeal and reviews the trial court's conclusions of law de novo.[4]  Whether a warrantless stop is constitutional presents a question of law this court also reviews de novo.[5]

Both the federal and Washington constitutions bar warrantless searches unless they fall within one of several narrow exceptions.[6]  A Terry investigatory stop is one exception to the warrant requirement.[7]  A Terry stop allows officers to seize a person briefly if specific articulable facts give rise to a reasonable suspicion that the person stopped is or has been involved in criminal activity.[8]  "A reasonable, articulable suspicion means that there 'is a substantial possibility that criminal conduct has occurred or is about to occur.'"[9]  When reviewing a Terry stop's validity, courts consider the totality of the circumstances,[10] delicately

---

[2] State v. Ross, 106 Wn. App. 876, 880, 26 P.3d 298 (2001).
[3] State v. Vickers, 148 Wn.2d 91, 116, 59 P.3d 58 (2002).
[4] Ross, 106 Wn. App. at 880.
[5] State v. Gatewood, 163 Wn.2d 534, 539, 182 P.3d 426 (2008).
[6] U.S. CONST. amend. IV; WASH. CONST. art. 1, § 7; State v. Doughty, 170 Wn.2d 57, 61, 239 P.3d 573 (2010).
[7] Terry, 392 U.S. at 21, 30.
[8] State v. Glover, 116 Wn.2d 509, 514, 806 P.2d 760 (1991).
[9] State v. Snapp, 174 Wn.2d 177, 197-98, 275 P.3d 289 (2012) (quoting State v. Kennedy, 107 Wn.2d 1, 6, 726 P.2d 445 (1986)).
[10] Glover, 116 Wn.2d at 514.

"balancing the interest of society in the enforcement of its laws against the individual's right to protection against unreasonable searches and seizures."[11]

"'[T]he determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior.'"[12] Courts consider factors such as the officer's training and experience, the location of the stop, the conduct of the person detained, the purpose of the stop, the amount of physical intrusion upon the suspect's liberty, and the length of time the suspect is detained.[13] Our Supreme Court has acknowledged that officers must be given some leeway when a stop involves a serious crime or potential danger.[14]

"A lawful Terry stop is limited in scope and duration to fulfilling the investigative purpose of the stop."[15] Similar to the analysis for determining the validity of the stop, the proper scope of a Terry stop depends on "the purpose of the stop, the amount of physical intrusion upon the suspect's liberty, and the length of time the suspect is detained."[16] If the initial investigation dispels the

---

[11]State v. Lesnick, 84 Wn.2d 940, 942, 530 P.2d 243 (1975).

[12] State v. Saggers, 182 Wn. App. 832, 840, 332 P.3d 1034 (2014) (quoting Illinois v. Wardlow, 528 U.S. 119, 125, 120 S. Ct. 673, 145 L. Ed. 2d 570 (2000)).

[13] State v. Acrey, 148 Wn.2d 738, 747, 64 P.3d 594 (2003).

[14] State v. Z.U.E., 183 Wn.2d 610, 623, 352 P.3d 796 (2015).

[15] Acrey, 148 Wn.2d at 747; see also Terry, 392 U.S. at 20 (stating that determining the reasonableness of a seizure involves a dual inquiry about "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place").

[16] State v. Williams, 102 Wn.2d 733, 740, 689 P.2d 1065 (1984).

officer's suspicions, the stop must end.[17] But if it confirms or further arouses the officer's suspicions, the officer may lawfully extend the scope and duration of the stop.[18]

Challenge to Finding of Fact

The State first challenges the trial court's finding that Officer Lemberg concluded that no assault had occurred. The trial court made the following finding of fact:

> Officer Lemberg observed no struggle between the man and woman or assault occurring prior to the stop. The defendant, Mark Alexander, and the woman denied an assault had occurred. Officer Lemberg inspected the woman's face for injury but did not observe any signs of injury. Officer Lemberg did not take any photographs of the woman's face. The defendant Alexander denied any relationship with the woman. Based on this, Officer Lemberg concluded that no assault had occurred.

The trial court relied on this finding to conclude that at this point, the purpose of the stop—to investigate an assault—was satisfied and Officer Lemberg no longer had authority to detain Alexander.

The State contends that the record does not support a finding that Officer Lemberg concluded that no assault occurred. The State notes that when the trial court made its oral ruling, the prosecuting attorney asked the court to clarify whether it was finding that Officer Lemberg testified that he concluded that no

---

[17] Acrey, 148 Wn.2d at 747.
[18] Acrey, 148 Wn.2d at 747.

-6-

assault had taken place. The court clarified that it "did not hear the officer state that he determined an assault had occurred; that he determined that there were no signs of injury at the time, after inspecting her for an injury, and that there were no statements from the victim . . . that . . . there had been physical contact with Mr. Alexander." The court accurately characterized Officer Lemberg's testimony. He never stated that he concluded that no assault had occurred.

Alexander argues that the court was entitled to draw this inference from the facts presented. We disagree. Evidence that the officer found no additional evidence to corroborate the assault described in the 911 call does not show that the officer concluded that no assault occurred. The court's finding that Officer Lemberg concluded no assault occurred is not supported by substantial evidence.

In addition, the State points out in its reply brief that the court based its inference on a misstatement of the facts. The court found that Officer Lemberg concluded that no assault occurred after he inspected Carlson's face. But he only interacted with Carlson after he ran Alexander's name. Thus, Officer Lemberg could not have determined that no assault occurred based on the lack of visible injury until after he searched for and found Alexander's records.

Challenges to Conclusions of Law (b)

Next, the State challenges the trial court's conclusion that Officer Lemberg exceeded the scope of the Terry stop when he ran Alexander's name through the law enforcement database. The trial court reasoned,

> The scope of the Terry stop was exceeded when Officer Lemberg ran the defendant Alexander's name though a law enforcement database. At this point, Officer Lemberg had conducted an investigation of the allegation of assault and determined no assault had occurred. The purpose of the Terry stop to investigate and determine whether an assault had likely occurred was satisfied. Determining there was not probable cause to arrest for assault, Officer Lemberg no longer had the authority to detain the defendant Alexander.[19]

Washington courts have often held that police may check for outstanding warrants during valid criminal investigatory stops.[20] These checks are

---

[19] This finding conflicts with the trial court's statement at the hearing that "through the process of the investigatory stop, [Officer Lemberg] was entitled to run . . . Mr. Alexander's information."

[20] State v. Williams, 50 Wn. App. 696, 700, 700 n.1, 750 P.2d 278 (1988) (citing State v. Kerens, 9 Wn. App. 449, 513 P.2d 63 (1973); State v. Thompson, 24 Wn. App. 321, 601 P.2d 1284 (1979), rev'd on other grounds, 93 Wn.2d 838, 613 P.2d 525 (1980)); see also State v. Chelly, 94 Wn. App. 254, 261, 970 P.2d 376 (1999) ("Checking for outstanding warrants during a valid criminal investigatory stop is a reasonable routine police practice, and warrant checks are permissible as long as the duration of the check does not unreasonably extend the initially valid contact."); State v. Madrigal, 65 Wn. App. 279, 283, 827 P.2d 1105 (1992) (holding that checking for outstanding warrant checks during valid criminal investigatory stop which took only about two minutes was not an unreasonable extension of the initial contact); State v. Reeb, 63 Wn. App. 678, 681-82, 821 P.2d 84 (1992); cf. State v. Rife, 133 Wn.2d 140, 146, 150, 943 P.2d 266 (1997) (holding that law enforcement had no statutory authority to run a warrant check after stopping someone for a routine traffic infraction without reaching the constitutional issues).

reasonable routine police procedures as long as they do not unreasonably extend the initial valid stop.[21] Federal courts have also held that law enforcement may run warrant checks during Terry stops.[22]

Here, the trial court concluded that the initial stop was a valid investigatory stop. Our legislature has directed that "[t]he primary duty of peace officers, when responding to a domestic violence situation, is to enforce the laws allegedly violated and to protect the complaining party."[23] A report of a man assaulting a woman along the roadway presents a potential domestic violence situation. The history of domestic violence in our society informs police officers about the risk of serious harm to its victims.

After stopping Alexander, Officer Lemberg questioned him for about two minutes before returning to his car to run the name. The computer search that revealed the no-contact orders took approximately two minutes. The other

---

[21] Williams, 50 Wn. App. at 700.

[22] E.g., United States v. Young, 707 F.3d 598, 606 (6th Cir. 2012) (holding that the officers did not exceed the scope of a Terry stop by running a warrant check); Klaucke v. Daly, 595 F.3d 20, 26 (1st Cir. 2010) (noting that "most circuits have held that an officer does not impermissibly expand the scope of a Terry stop by performing a background and warrant check, even where that search is unrelated to the circumstances that initially drew the officer's attention"); United States v. Villagrana-Flores, 467 F.3d 1269, 1275 (10th Cir. 2006) (holding that a police officer did not violate the Fourth Amendment by obtaining a suspect's identity and performing a warrants check while conducting a valid investigative stop where the suspect was detained for a relatively short period).

[23] RCW 10.99.030(5).

officers then questioned Carlson about her identity. Within a few more minutes, they discovered Carlson's identity by looking up her picture. Officer Lemberg then arrested Alexander for violating a protection order approximately nine minutes after the initial stop.

When an officer conducts a valid investigatory stop to determine whether an assault occurred following a reliable informant tip, that officer may check for outstanding warrants. Under these facts, Officer Lemberg properly ran Alexander's name through the law enforcement database during the investigative stop.

The State also challenges the trial court's conclusion that Officer Lemberg exceeded the scope of the Terry stop when he questioned Carlson about her identity. The court reasoned,

> [T]he scope of the stop was certainly exceeded when Officer Lemberg, with the defendant Alexander still detained, conducted a second round of questioning of the woman regarding her identity and the no contact orders. Officer Lemberg provided no articulable facts that supported his hunch that the woman was the subject of the no contact orders. At no point during her interaction with Officer Lemberg or the other officers did she say anything or act in a manner that would indicate there was an active no contact order with the defendant Alexander. Nor was her giving of a false name without more, reason to believe she was the subject of the no-contact orders. Her reluctance to give her true name to the police could reasonably have been attributed to her having a criminal record.

Two cases provide help in deciding whether Officer Lemberg had sufficient articulable facts to continue his search. The State compares the facts of this case to State v. Pettit.[24] Alexander distinguishes Pettit and claims this case is more like State v. Allen.[25] From our comparison of these two cases, we conclude that the facts here gave Officer Lemberg reasonable suspicion that Alexander was violating a no-contact order and justified an inquiry into the identity of the woman with him.

In Pettit, a sheriff's deputy stopped Pettit because his car had a loud exhaust.[26] A record check revealed that no-contact orders restrained him from contacting a 16-year-old girl, Michelle Whitmarsh.[27] A female passenger in the front seat appeared to be about 16.[28] The passenger gave the deputy the name Samantha Wright and a birth date.[29] He ran that name and found no record.[30] Dispatch also provided him information about Michelle Whitmarsh.[31] The passenger matched the description from dispatch.[32] The deputy arrested Pettit

---

[24] 160 Wn. App. 716, 251 P.3d 896 (2011).
[25] 138 Wn. App. 463, 157 P.3d 893 (2007).
[26] Pettit 160 Wn. App. at 718.
[27] Pettit, 160 Wn. App. at 718.
[28] Pettit, 160 Wn. App. at 718.
[29] Pettit, 160 Wn. App. at 719.
[30] Pettit, 160 Wn. App. at 719.
[31] Pettit, 160 Wn. App. at 719.
[32] Pettit, 160 Wn. App. at 719.

for violating the no-contact order. Division Two affirmed the trial court's decision to deny Pettit's motion to suppress Whitmarsh's identity.[33] The court reasoned,

> Deputy Watson knew that the no-contact order protected a 16-year-old girl named Michelle Whitmarsh from Pettit and that Pettit's front seat female passenger appeared to be 16. These facts were sufficient to support a rational inference warranting the officer's initial request for the passenger's identification to determine whether she was the person whom the no-contact order sought to protect. Pettit's female passenger provided a birth date that was not consistent with her apparent age, justifying the subsequent records check, which then led to the corroborating physical description, including the identifying tattoo on her left hand. The additional investigation was brief and did not significantly extend the duration beyond that of a typical traffic stop.[34]

The court also noted that Whitmarsh's status as a minor who had been reported missing presented exigent circumstances warranting the brief detention.[35]

In Allen, police stopped a car for failure to have a working license plate light.[36] Allen was a passenger in the car.[37] The officer checked the driver's information and discovered that she was "'a [petitioner] in a protection order.'"[38] The officer also learned that the restrained party was named Allen but did not know the gender or have a description.[39] The officer asked for Allen's identity;

---

[33] Pettit, 160 Wn. App. at 719, 722.
[34] Pettit, 160 Wn. App. at 720-21.
[35] Pettit, 160 Wn. App. at 721-22.
[36] Allen, 138 Wn. App. at 465-66.
[37] Allen, 138 Wn. App. at 465.
[38] Allen, 138 Wn. App. at 466.
[39] Allen, 138 Wn. App. at 466.

both Allen and the driver gave a false name.[40]  After checking the given name with dispatch and discovering it was false, the officer questioned the driver further about the passenger's identity.[41]  The driver eventually identified the passenger as Allen.[42]  Division Two decided that the trial court should have suppressed the identification of Allen.[43]  It reasoned, in part, that "[w]ithout knowledge that the passenger provided a false name, [the officer] did not possess reasonable articulable facts to believe that the no-contact order referred to the passenger."[44]

This case differs from Pettit because Officer Lemberg had no description of the protected person.  But unlike in Allen, he had other articulable facts to suggest that the woman with Alexander was the protected party.  Officer Lemberg was following up on a reliable informant tip reporting an assault when he discovered the domestic violence no-contact orders.  Although he found no corroborating evidence to support the assault, based on his experience investigating assaults and domestic violence incidents, he knew that victims often stay with the assaulter.  In addition, Alexander denied any relationship with the woman with whom he had been walking and talking, admitted that the two had

---

[40] Allen, 138 Wn. App. at 466.
[41] Allen, 138 Wn. App. at 466-67.
[42] Allen, 138 Wn. App. at 467.
[43] Allen, 138 Wn. App. at 472.
[44] Allen, 138 Wn. App. at 471.

been arguing, and that he had gotten into her face. And both Alexander and the woman demonstrated unwillingness to reveal her identity. Thus, unlike in Allen, but like in Pettit, Officer Lemberg had enough facts to raise a reasonable suspicion that a no-contact order was being violated.

Unlike in Pettit, this case does not involve a missing child. But it does involve an alleged recent assault, admitted quarreling, and a domestic violence no-contact order, thus warranting Officer Lemberg's investigation into the woman's identity.[45]

Here, the Terry stop involved detention of an alleged assailant and victim, a very recent assault, a warrant check disclosing a protection order, admitted quarreling, and unwillingness to disclose the alleged victim's identity. These facts provided Officer Lemberg with sufficient reasonable suspicion to investigate whether the woman with Alexander was the protected person. Indeed, the public policy expressed by our legislature in RCW 10.99.030(5) makes the protection of that victim a primary duty of the officer. Officer Lemberg did not exceed the proper scope of the Terry stop.

## CONCLUSION

The trial court erred in concluding that Officer Lemberg exceeded the

---

[45] See State v. Jacobs, 101 Wn. App. 80, 89 n.3, 2 P.3d 974 (2000) (where the existence of a domestic violence no-contact order was relevant to the court finding exigent circumstances justified a warrantless search of a home).

-14-

scope of the <u>Terry</u> stop.  It should not have suppressed the evidence of the no-contact orders.  We reverse and remand for further proceedings consistent with this opinion.

_____  Leach, J.

WE CONCUR:

_____  _____
Spearman, J.P.T.          Schindler, J