[No. 257-41236-2. Division Two. December 10, 1970.]

THE STATE OF WASHINGTON, *Respondent,* v. GARNER EARL
BROOKS, *Appellant.*

*Jack A. Richey* (of *Barokas, Martin, Richey & Schaefer*),
for appellant (appointed counsel for appeal).

*Charles O. Carroll, Prosecuting Attorney,* and *Robert S.
Bryan, Deputy,* for respondent.

PEARSON, J.—This is an appeal from a conviction and
sentence for the crime of second-degree assault. The issues

raised by the appeal require a recitation of the following facts.

At approximately 8:30 p.m. on a snowy January 11, 1969, Seattle Police Officers Garner and Spaulding were patrolling their area of responsibility in Seattle's central area. They saw a white car coming toward them at a rapid rate and when it turned left in front of them, they decided to follow it until they could check its license number against their stolen vehicle "hot sheet." The two vehicles proceeded southbound on 21st Avenue for approximately one block until the white car made a sudden stop and several people quickly exited. Officer Garner testified that one of these people was carrying a long-barrelled weapon. He watched this man for a moment but then his attention was drawn to another of the men, who was moving away from the car in a direction opposite that of the man with the rifle. The second man stopped, pivoted, raised his arm, and then fired on the police vehicle at point blank range. The round, from a .45 caliber service automatic, broke the windshield of the police car and then struck a police shotgun and a roll bar before coming to rest on the front seat of the car. Both officers went down, Garner taking the microphone for the radio with him. He called for help, giving his location. Then the officers went out the doors of the patrol car and Garner once again made the help call. Finally, a third call was made, while the officers were still on the ground. This call included a description of a bushy-haired Negro male, 5 feet 10 inches tall, about 20 years old, and dressed in a three-quarter-length, black leather jacket and dark clothing. As Officer Garner and several other state's witnesses admitted, this general description would fit many people in this particular neighborhood. The last that the officers who had come under fire saw of their assailants was four figures running off westbound, between houses in about the middle of the block (or one-third block south of the shooting) and toward 20th Avenue.

The scene now shifts one block west and about three-fourths block south, just up from the corner of 20th Avenue

and Alder Street. There Officers Liskoski and Germann arrived within about a minute of the time the help call went out. As they stopped their vehicle, they observed defendant walking north from Alder Street on the east side of 20th Avenue, and Liskoski thought defendant had finished a long stride when he was first seen. Officer Bailey, who arrived at 21st Avenue and Alder Street at about the time of the first shot, had observed three people run between the houses toward 20th Avenue. Defendant was observed to stop near two children and kneel down, apparently conversing with them for a few seconds. He then rose and proceeded to walk northbound on 20th Avenue. Defendant had on a dark three-quarter-length, black leather jacket and dark grayish-colored levis. He was approximately 5 feet 10 inches tall, and a young, bushy-haired Negro male.

Officer Liskoski's partner, Officer Germann, exited the car, carrying his shotgun at the ready and called to defendant to halt and come over to the patrol car. The officers noted defendant appeared to be breathing heavily as though he were frightened or had been exercising. Defendant immediately complied, by beginning to move across the street as Germann walked to meet him. Both officers testified that Brooks was never evasive or at all uncooperative. Officer Germann testified that he asked defendant what was going on and defendant replied that he did not know, but that he had heard shots and was making his way out of the area. Defendant told Germann that he was unarmed and had not been involved in any shooting.

Officer Germann declared to defendant that he was going to be patted down for weapons. Defendant, in the face of the shotgun, did not object. Officer Germann testified that this search revealed an *empty* shoulder holster on defendant's person. This holster was subsequently admitted in evidence over defendant's objection. Defendant was then asked to get into the police car "until we find out what is going on." Defendant moved to the car and as he entered, a second individual appeared, coming from the west side of

20th Avenue, perhaps northbound. (It will be remembered that the shooting occurred northeast of the Germann-Liskoski car.) Nothing in the record indicates the description of this individual or the speed with which he moved or the quality and quantity of his breathing. He just suddenly walked up and began asking the officers what they wanted with defendant and urging them to let defendant go. This individual was ordered to leave or he would be arrested. The record indicates that this unidentified man went back toward a house on the west side of 20th Avenue. Soon after the encounter with the second man, Officer Germann went over to Officer Bailey and the two began looking about the general area.

The two officers shortly ended this initial search and Germann returned to his patrol car. At about this time, Sgt. Sands arrived at the scene. The sergeant and defendant apparently knew each other, for they exchanged greetings. Then the sergeant directed the officers to take defendant to police headquarters.

Somewhat later, a considerable force of officers came on the scene and made a search of the whole area. They found footprints leading between houses and followed these *north* up an alley to Jefferson Street, where they were lost in the traffic. No search was made of the alley to the south. In a search around buildings, a rifle and a cocked .45 caliber automatic with a clip in place were found. This latter weapon was placed in the police evidence locker in a cocked state. About 3 weeks later, the police criminologist removed the weapon for examination and found it to be uncocked. Despite a careful record-keeping system and a close watch over all physical evidence, no one called by either party could offer any explanation for this change in condition of the weapon. The criminologist removed the clip and found defendant's thumbprint thereon. It was also shown that this gun had fired the round which entered the police car. Both the gun and clip were admitted into evidence.

This case presents us with two questions. The first is whether the detention and search of defendant conformed to the requirements of the federal and state constitutions. Second, we must determine whether the chain of custody of the automatic pistol was sufficient to allow its admission into evidence at defendant's trial.

The starting point for any consideration of a "stop and frisk" situation after June, 1968 is the landmark decision in *Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968). In that case, Officer McFadden observed Terry and another man looking in a store window. He stopped to observe and while he watched, the two men walked around a building for about 10 minutes, carefully checking windows and doors and holding conversations between trips. Then he followed the two men until they met a third person and all three engaged in conversation. The officer approached and asked the three what was going on. After receiving a mumbled evasion, he proceeded to pat down Terry, finding a gun in his coat pocket. He was arrested and later charged with carrying a concealed weapon, which weapon was allowed in evidence.

 In upholding the search and seizure, the Supreme Court analyzed the facts in terms of balancing the individual's right to be free of harassing searches and seizures which lack reasonable basis, with the needs of police work and particularly the need for officers to protect their own safety and that of citizens in the immediate area. The court recognized that a major source of friction between police and minority groups is the field interrogation, often conducted as a harassing tactic designed to fill a felt need to assert power and authority on the part of beat patrolmen.[1] This type of conduct cannot pass the constitutional test imposed upon the state by the Fourth and Fourteenth Amendments. (We do not find such conduct present in this case.) Finally, the key question is the reasonableness under all the circumstances of the governmental invasion of a

[1]The President's Commission on Law Enforcement and Administration of Justice, *Task Force Report: The Police* 178-193 (1967).

citizen's personal security. The officer may, limited to outer garments, search when he reasonably believes himself to be in the company of one presently armed and dangerous, where in the course of his investigation he has identified himself as a policeman and received no information that serves to dispel his initial reasonable fears. As the teachings of *Terry's* companion case, *Sibron v. New York,* 392 U.S. 40, 20 L. Ed. 2d 917, 88 S. Ct. 1889 (1968), show us, the reasonableness question is preeminently one of fact. Of course, it is axiomatic that the reasonableness issue must be judged on facts known to the officer before he undertakes the search. The fruits of a search cannot be used to justify making it. *Henry v. United States,* 361 U.S. 98, 4 L. Ed. 2d 134, 80 S. Ct. 168 (1959); *Johnson v. United States,* 333 U.S. 10, 92 L. Ed. 436, 68 S. Ct. 367 (1948).

When the facts of the instant case are viewed in the light of constitutional imperatives, we conclude that the conviction of this defendant must be affirmed.

First, we have Officers Germann and Liskoski arriving one block east of the scene of a serious felony within approximately 1 minute of its occurrence. It was reported to them that several suspects were fleeing in that general direction, at least two of whom were armed. The officers knew that one of the fleeing persons had fired upon the police vehicle with a hand gun and that this person was a young, bushy-haired Negro male, approximately 5 feet 10 inches in height, wearing a three-quarter-length, black leather jacket. In addition, defendant appeared to be breathing heavily when observed by Germann and was well within the area where the suspected assailant might be.

It is our opinion that in the charged atmosphere which existed at the time and place, Officer Germann was fully justified in suspecting that defendant was armed and that the search which disclosed the shoulder holster was reasonable within the guidelines laid down in *Terry v. Ohio, supra.* To hold otherwise would require us to disregard the safety of the officers. This we are unwilling to do.

Nor do we believe that defendant's apparent cooperative and non-belligerent attitude when confronted by Officer Germann should alter our opinion. For all the officer knew at the time, such nonchalance might have been intended as a guise to induce him to drop his guard.

We are also not persuaded that because the police declined to "stop and frisk" the unidentified man who came from a direction opposite to that from which defendant had come, demonstrated that the officers acted unreasonably in searching defendant. In commenting upon this argument, the able trial judge stated:

> But this is a kind of argument that I consider a non sequitur. It might be that you could argue to me persuasively that they ought to have arrested that fellow, but . . . but they didn't. But that still doesn't mean that they acted unreasonably in searching the defendant in this case, and that they acted without just cause in placing him under arrest in view of the totality of the events of that occasion climaxed by the pat down and discovering that, of all things, this man was carrying a holster which could have concealed a weapon.

We hold that where a crime of violence has occurred and where the police officers are at the scene within moments thereafter and have a general description of one of the offending suspects, such officers are within constitutional limits in stopping and searching persons found in that general area who match the general description of the suspects. *See Terry v. Ohio, supra.*

Accordingly, the search was reasonable, the arrest was lawful, and the evidence was properly admitted.

We turn next to the question of the admissibility of the .45 caliber automatic and its clip. This weapon was found cocked, with the clip in place, and was placed in the police property room in the same condition, with instruction it was not to be touched until it had been fingerprinted. In such cases, we are told, the police regulations demand an elaborate series of log entries and authorizations before anyone may even touch, let alone change or move, the evidence. Nothing in the police logs discloses anyone's com-

ing in contact with the weapon. However, the weapon was fully cocked when turned in and uncocked at the time of the next authorized touching of it by the police criminologist. The latter's testimony showed that there was a live round in the chamber and other rounds in the clip. It thus seems to us unlikely that the hammer fell by itself, since to do so would have discharged a round—an event likely to be noted in anyone's log. This leaves us with only one other possibility: some unknown person or persons uncocked the gun while it rested in the police department's custody. We must now determine whether such tampering was sufficient to warrant exclusion of this evidence.

The doctrinal orthodoxy to be applied in situations of this kind is well settled. *See State v. Calhoun,* 60 Wn.2d 488, 374 P.2d 555 (1962). A good statement of the rule is found in *Gallego v. United States,* 276 F.2d 914 (9th Cir. 1960). In that case, it is said that the key requisite for admissibility of physical evidence in a criminal trial is a showing to the trial court that the object is substantially in the same condition as when the crime was committed. The nature of the article, the circumstances surrounding its preservation and custody, and the likelihood of tampering with it are factors to be considered in answering the question of admissibility. The defendant must show abuse of the trial court's discretion in order to overturn admission of evidence. *Myers v. Harter,* 76 Wn.2d 772, 459 P.2d 25 (1969).

In this case, we cannot say that admission of the challenged evidence amounted to an abuse of discretion. While it is an axiom this court ever holds to, that where the liberty of an individual is at stake, the state must not be allowed to cut any corners in procedure or substance, this particular case does not present us with such a problem. Here a cocked and presumably loaded weapon was present in the police property room. Such a weapon seems to us to present enough of a danger to personnel in this area that they should not be deprived of the use of evidence because they rendered it less dangerous to themselves. Certainly it

would be the better practice to rigidly follow police regulations, but in this particular case, danger to personnel was involved, and it is possible that either the officer who discovered the weapon or the criminologist was in error about its cocked state when they testified months after the event. The trial court heard testimony about the police procedures and the care with which evidence is guarded. It was apparently convinced that no significant tampering which changed the condition of the clip (the key portion of the weapon here) had occurred. On the record we have, we are unable to say this constituted an abuse of discretion.

Affirmed.

ARMSTRONG, C. J., and PETRIE, J., concur.

Petition for rehearing denied January 18, 1971.