[No. 7353-2-I.   Division One.   March 31, 1980.]

THE STATE OF WASHINGTON, *Respondent,* v. CLIFTON BROADNAX, JR., ET AL, *Defendants,* STEVEN ARTHUR THOMPSON, *Appellant.*

*Rebecca M. Baker,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *J. Robin Hunt, Deputy,* for respondent.

WILLIAMS, J.—Steven Arthur Thompson was charged and convicted of illegal possession of a narcotic drug, heroin. The question presented is whether the trial court was correct in ruling admissible a balloon of heroin taken from Thompson during a warrant search of a house where he was present.

The facts may be summarized as follows: A magistrate issued a warrant for the search of a Seattle residence upon the basis of an affidavit containing information that within the previous 24 hours narcotics had been offered for sale at the house by a person residing there. Four police officers conducted the search. One of them, Detective Buckland, was posted to guard the back door while the other three entered through the front door. After they had done so, Buckland went in to find Thompson and another man each standing with his hands on his head. Buckland asked one of the officers whether Thompson had been searched, was told he had not been, and proceeded to frisk Thompson for weapons. While doing so, he felt a small bulge in Thompson's left shirt pocket. Detective Buckland, an experienced narcotics officer, testified concerning the bulge as follows:

Q And based on your patting or feeling this substance in the pocket did you recognize it at that particular time? A I recognized a feeling in a tactile sense as something that has been very familiar in other instances that I have found. Q Can you describe that. A A small bulge that has a—it gives. Q And what have you known this to be on other occasions? A I have found it on other occasions to be balloons of heroin, or some other substance. Q Now, Detective, you previously mentioned that you checked the belt area and other areas for possible weapons. You also mentioned a wallet. . . . Q You didn't have any belief at all it was a 'weapon? A No, I didn't believe it was a weapon, that's correct. Q You believed it was a balloon of heroin? A That's what I believed it to be, yes.

Buckland then removed a balloon, later found to contain heroin, from Thompson's pocket.

▇ Thompson contends that the heroin should be suppressed as evidence because the search of his person violated his Fourth Amendment rights. Specifically, he argues that the frisk was not justified under *Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968) and that, in any event, Detective Buckland exceeded the permissible scope of a *Terry* frisk in reaching into his pocket to remove the balloon. In that case, the United States Supreme Court said at page 24:

When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm.

Under the circumstances, nothing could have been more reasonable than for the officer to conduct a pat–down search for weapons while performing this inherently dangerous court–ordered duty. *United States v. Peep*, 490 F.2d 903, 905 (8th Cir. 1974); *State v. Sloughter*, 14 Wn. App. 814, 545 P.2d 32, *review denied*, 87 Wn.2d 1003 (1976);

*People v. Finn,* 73 Misc. 2d 266, 340 N.Y.S.2d 807, 814–16 (1973).

In the recent case of *Ybarra v. Illinois,* 444 U.S. 85, 62 L. Ed. 2d 238, 100 S. Ct. 338 (1979) the frisk for weapons was conducted upon customers in a public tavern at a time when the police were executing a search warrant covering the tavern and its bartender. The warrant had been issued upon the advice of an informant that the bartender, while on duty, was selling packets of heroin. The Supreme Court held that the search of Ybarra, a customer, was not justified because

> the agents knew nothing in particular about Ybarra, except that he was present, along with several other customers, in a public tavern at a time when the police had reason to believe that the bartender would have heroin for sale.

*Ybarra v. Illinois, supra* at 91.

The court in deciding that there was not probable cause to believe that any of the customers would be involved said:

> a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person. *Sibron v. New York,* 392 U. S. 40, 62–63 [20 L. Ed. 2d 917, 88 S. Ct. 1889 (1968)].

*Ybarra v. Illinois, supra* at 91.

In this case, Thompson was not searched because of mere propinquity to a bartender in a tavern where he was a customer. Rather, he was one of two adults in a house where narcotics had probably been sold within the preceding 24 hours by a person residing therein. It would be unwise to suggest that the police should ignore the individuals present on the assumption that they were unarmed and uninvolved.

■ Detective Buckland's subsequent seizure of the balloon from Thompson's shirt pocket was justified because he had recognized the bulge as a balloon containing narcotics. Detective Buckland then had probable cause to arrest and seize the balloon as contraband and as evidence of crime.

*State v. Hammond,* 24 Wn. App. 596, 603 P.2d 377 (1979). As was said in *State v. Gluck,* 83 Wn.2d 424, 426–27, 518 P.2d 703 (1974):

Probable cause [to arrest] exists where the facts and circumstances within the arresting officer's knowledge and of which he has reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in a belief that an offense has been or is being committed.

■ Probable cause may be based upon knowledge gained through any of the senses. *State v. Hammond, supra; State v. Huckaby,* 15 Wn. App. 280, 291, 549 P.2d 35, *review denied,* 87 Wn.2d 1006 (1976); *State v. Compton,* 13 Wn. App. 863, 538 P.2d 861 (1975). Logically, there is no difference in power of recognition between use of the tactile rather than the visual sense. An object may be perceived by touch equally as well as by sight.

It should be noted that this result squares with the principles of the plain view doctrine. That doctrine has three requirements:

*a prior justification for intrusion, an inadvertent discovery of incriminating evidence, and immediate knowledge by police that they have evidence before them.*

*State v. Murray,* 84 Wn.2d 527, 534, 527 P.2d 1303 (1974), *quoting State v. Dimmer,* 7 Wn. App. 31, 33, 497 P.2d 613 (1972).

Those criteria were met in this case.

Affirmed.

SWANSON, J., concurs.

SWANSON, J. (concurring)—I concur in the court's decision, and I wish to emphasize my reasons for doing so.[1]

---

[1] I note the impressive array of early authority assembled by the dissent under the heading "Basic Principles." I am in full agreement with and support enthusiastically the interesting discussion of the basic principles of Fourth Amendment jurisprudence, but fail to see the relevance to this case of the bulk of the tomes cited.

The initial search for weapons of defendant Thompson was permissible under *Terry v. Ohio,* 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968). *Ybarra v. Illinois,* 444 U.S. 85, 62 L. Ed. 2d 238, 100 S. Ct. 338 (1979), which held that *Terry* did not justify a cursory search for weapons of a tavern patron when a search warrant for the tavern was being executed, is factually distinguishable. In *Ybarra,* the petitioner was one of 9 to 13 persons in a public establishment. The officers did not recognize Ybarra and had no reason to believe he might assault them. Further, he made no gestures, and he generally acted in a nonthreatening manner. The Supreme Court summarized, "In short, the State is unable to articulate *any* specific fact that would have justified a police officer at the scene in even suspecting that Ybarra was armed and dangerous." (Italics mine.) *Ybarra,* at 93.

This case stands in sharp contrast to *Ybarra.* Here, the search warrant was for a private residence. The officers had information that "within the last 24 hours the informant was present at the above address and saw what the informant recognized to be Heroin and Dilaudid that was being offered for sale by a negro male known as Clifford and who resides at the above address."

In executing the warrant, Detective Buckland was directed to stand guard at the rear door. Sergeant Scheuffele and Detectives Baylor and Roesler entered the house through the front door. The officers discovered a teenage girl, a baby, and two adult males in the living room. The males were the defendant Thompson and one Clifton Broadnax, evidently the "Clifford" referred to in the affidavit for the search warrant.[2] Scheuffele, who was in charge of the unit, instructed Broadnax and Thompson to raise their arms over their heads, and he and Detective Baylor

---

[2]The dissent states that the majority "expeditiously ignore[s] the presence of others on the premises than Broadnax and Thompson" to shore up its justification for frisk of Thompson. However, if the police feel a teenage girl and an infant present no threat, I see no reason to read any significance into their failure to frisk them.

remained with the suspects while Roesler continued through the house.

Buckland meanwhile had been at his position at the rear door for about 30 seconds when he saw that the other officers had entered the house. He then went around to the front and entered, observing Broadnax and Thompson, arms overhead. At this point, no one apparently had been searched. Scheuffele testified that as long as the suspects had their arms raised, he wasn't too concerned about weapons.[3] However, he said he did notice a bulge in Broadnax' pocket "that piqued my interest and I was concerned about my own safety and the safety of my detectives . . ." He further stated that "like I say, there was a bulge in the pocket that I didn't want any hand near except my own or someone else's, some detective's." By this time Roesler had returned from a bedroom where he had discovered contraband in plain view and a woman. Scheuffele ordered Roesler to search Broadnax. At about the same time Buckland, who assumed Thompson and Broadnax were under arrest, asked Scheuffele if Thompson had been searched: "I asked Sergeant Scheuffele if the defendant Mr. Thompson had been searched. He stated No. I believe I said, 'Would you like him to be searched?' He said Yes or words to that effect."[4]

---

[3]I cannot subscribe to the dissent's view of the record. Scheuffele stated that, "As long as we could see their hands at that point it wasn't imperative that they be patted down." The dissent apparently reads this as "express testimony" that the officers had no reasonable belief or suspicion that Thompson was armed. I take Scheuffele's testimony to mean what it says: that as long as, and only as long as, the suspects had their arms raised, Scheuffele was not concerned about weapons. He clearly did not expect the suspects to keep their hands over their heads indefinitely.

[4]The record is unclear regarding the time of Buckland's search of Thompson relative to other events. Buckland testified that Roesler did not return from the bedroom and announce discovery of the contraband until after Thompson had been searched. Scheuffele stated that the search of Broadnax, which was conducted by Roesler, was contemporaneous to the search of Thompson and that he, Scheuffele, did not see Thompson being searched because he was watching

To summarize, this case presents a situation where three officers entered through the front door and one, Roesler, continued through the house. The two adults were detained with their hands over their heads. Seconds later, Buckland entered. Scheuffele, who was in command, believed Broadnax was armed and feared for his officers' safety. Scheuffele ordered Broadnax searched and answered yes when Buckland asked if Thompson should be searched. Either shortly before or shortly after Thompson was searched, Roesler returned and announced the discovery of the contraband, and the suspects were arrested. Total elapsed time was a matter of seconds. Even the most tortured version of these facts fails to fall within the ambit of *Ybarra.*

I have no quarrel with the language from *Ybarra,* quoted in the dissenting opinion, that nothing in *Terry* permits "a frisk for weapons on less than reasonable belief or suspicion directed at the person to be frisked, even though that person happens to be on premises where an authorized narcotics search is taking place." *Ybarra,* at 94. *Terry,* however, makes clear that the appropriateness of an officer's actions is judged against an objective standard: would the facts available to the officer at the moment of seizure or search, warrant a man of reasonable caution in the belief that the action taken was appropriate? *Terry,* at 21–22.

In this case, Sergeant Scheuffele, who commanded the unit, expressly testified he feared for his safety and the safety of his detectives.[5] Scheuffele thus ordered Broadnax

---

Roesler search Broadnax. Roesler testified that Buckland was present with the others when he returned from the bedroom.

[5]Buckland testified that he did not believe the balloon of heroin in Thompson's pocket was a weapon. In fact, the trial court found that "Detective Buckland did not personally believe the defendant possessed a weapon at the time of the search." Finding of fact No. 7. This is an inartfully drawn formal finding. The court stated in its oral decision that "[t]he circumstances involved here are sufficient to warrant the officer in conducting a frisk type of search, that is for the security of the officer and to make certain there are no weapons." I think the trial court's formal finding is an expression of the court's conclusion, based on Buckland's testimony that he didn't think the balloon felt like a weapon, that Buckland drew his conclusion *after* feeling the balloon. I do not take finding of fact No.

to be searched, and by answering yes to Buckland's question, in effect, ordered Thompson to be searched. This case therefore satisfies the subjective element required by *Terry*. Further, judged against *Terry*'s objective test, I have no trouble finding the search of Thompson appropriate. I am reluctant to engage in judicial second–guessing. As has been said in a slightly different context,

> The officers' on–the–spot decision is of necessity a hasty judgment based upon the facts—or reasonably founded suspicion—of the moment. Severe judicial second–guessing is therefore inappropriate. The officer must be given a degree of latitude for good faith judgment as to his own possible peril, . . .

*State v. Mitchell*, 6 Ore. App. 378, 386, 487 P.2d 1156 (1971).

The suggestion is made, however, that even granting the validity of the patdown, seizure of the heroin was improper because the search went beyond the scope of a limited search for weapons.[6] However, as I read the record, Buckland identified the item in Thompson's shirt pocket as a balloon of heroin *before* he reached his hand into the pocket and confirmed his discovery. His testimony was "[w]hen I first pat searched him for weapons I could feel a small bulge in his pocket, a small bulge in his shirt pocket. *After this* I did go into the pocket." (Italics mine.) Thus, Buckland discovered the contraband within the limited scope of a search for weapons, and the search was not a "general exploratory search for whatever evidence of criminal activity he might find." *Terry*, at 30.[7]

---

7 to mean that prior to beginning the patdown Buckland did not believe Thompson was armed.

[6] The dissent appears to attach significance to the fact that Buckland described his actions as a "search" and not a "frisk." I do not think Buckland's characterization is significant, but if it is, his testimony demonstrates that he initiated a search for *weapons*.

[7] *Cf. Sibron v. New York*, 392 U.S. 40, 20 L. Ed. 2d 917, 88 S. Ct. 1889 (1968) where the initial intrusion took the form of the officer thrusting his hand into

The court's attention has been drawn to our Supreme Court's recent decision in *State v. Allen*, 93 Wn.2d 170, 606 P.2d 1235 (1980), a case which appears similar, but close examination discloses critical factual differences. In that case, during a search for weapons, the officer took the defendant's wallet, opened it, discovered a folded–up dollar bill and discovered contraband within the bill. The court said, "[o]nce it is ascertained that no weapon is involved, the government's limited authority to invade the individual's right to be free of police intrusion is spent." *Allen*, at 173. I think *Allen* paints with too broad a brush. The expansive language is appropriate in the factual context of the case; however, no claim was there made, or could have been made, that discovery of the wallet established probable cause for arrest or further search. In fact, the State attempted to justify the search of the contents of the wallet on the ground the officer was looking for the defendant's identification. I don't think the court in *Allen* intended to say that when an officer discovers contraband within the scope of a permissible patdown for weapons, he must close his eyes to the discovery.

I concur in the majority opinion's discussion of the question of whether Buckland's discovery of the balloon through the material of the shirt pocket was sufficient to give rise to probable cause. I would only emphasize that there is authority, in this and other jurisdictions, that evidence discovered during the course of a search for weapons can provide the basis for probable cause. *See State v. Dunn*, 22 Wn. App. 362, 591 P.2d 782 (1979); *Guzman v. Estelle*, 493 F.2d 532 (5th Cir. 1974); *Johnson v. United States*, 367 A.2d 1316 (D.C. Cir. 1977); *Lyles v. Florida*, 312 So. 2d 495 (Fla. Dist. Ct. App. 1975).

RINGOLD, J. (dissenting)—I respectfully dissent. The facts stated by the majority are incomplete and controlling

---

Sibron's pocket, and the State attempted to justify the search solely on the basis of probable cause to believe Sibron possessed heroin.

authority is disregarded by reliance upon an immaterial distinction. The guaranties embodied in the Fourth Amendment implicated here are essential not only to our ordered sense of liberty, but also to the very foundations of free government. Those fundamental principles insure human dignity by means of restraints of governmental invasion of privacy.

Detective Edward Roesler obtained a search warrant for the premises at 6539 Third Avenue Northwest in Seattle. The warrant named no persons, but in his affidavit, Detective Roesler referred to "a male known as Clifford . . . who resides at the above address." Detective Richard Buckland, Jr., had not read the warrant or the supporting affidavit; he knew only that they were looking for narcotics.

When the officers arrived at the residence, Detectives Roesler and Baylor, and Sergeant Scheuffele, the sergeant in charge, entered while Detective Buckland remained outside momentarily to make sure no one left through the back door. Upon the officers' entry there were in the living room a young woman, a small infant, Clifton Broadnax and the defendant. Detective Roesler instructed Broadnax and Thompson each to put their hands up.

After about 30 seconds outside the rear of the building, Detective Buckland entered. He saw Sergeant Scheuffele, the infant, the woman, Broadnax and Thompson; Broadnax and Thompson were standing with their hands on their heads. Detective Buckland asked "Would you like him [Thompson] to be searched?" and the sergeant gave an affirmative response. Detective Buckland began the *search* of the defendant.

Sergeant Scheuffele testified: "Buckland asked me if Thompson had been searched and I took that to mean frisked and I answered that he hadn't because he hadn't." Detective Buckland was assuming that Thompson was already under arrest. He testified on cross–examination:

Q . . . Now, when you searched Mr. Thompson . . ., to your knowledge no narcotics had been found. Is that correct?

A That's correct. Well, excuse me. If I may back up on that. I presumed something was found because when I entered I presumed that the defendant was under arrest.
Q And then later on you found no one was under arrest. Is that correct?
A That's correct.

Neither Sergeant Scheuffele nor Detective Buckland testified or stated that there were any fears that Thompson might have weapons. Sergeant Scheuffele who was present in the room before and during the search twice testified that he saw no reason to do a patdown "as long as we could see their hands."

The State and the majority seek to justify the seizure of the evidence by turning a search of a person into a "patdown frisk" permissible under *Terry v. Ohio,* 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968), which resulted in probable cause to arrest. Even if we treat the search as a patdown frisk there was no justification for the frisk. Even if the frisk could be justified, seizure of the contraband was beyond the scope of the frisk. Further, there was no probable cause to arrest.

### PROPRIETY OF FRISK

While this case was pending before this court, the United States Supreme Court issued its opinion in *Ybarra v. Illinois,* 444 U.S. 85, 62 L. Ed. 2d 238, 100 S. Ct. 338 (1979). Ybarra was a patron of a public tavern; during the execution of a warrant authorizing a search of the premises and the bartender, Ybarra was subjected to a pat–down frisk by an officer who felt a "cigarette pack with objects in it" in Ybarra's pants pocket. He did not remove this pack but moved on to pat down other customers. Later he returned and removed the cigarette pack from Ybarra's pocket. Inside the pack he found six tinfoil packets of heroin. As here, the State argued that the "pat down yielded probable cause to believe that Ybarra was carrying narcotics and that this probable cause constitutionally supported the second search. . . ." *Ybarra,* at 92. The court, not reaching

that precise question, held that the patdown was unjustified. In language directly applicable to this case, the court said:

Nothing in *Terry* can be understood to allow a generalized "cursory search for weapons" or, indeed, any search whatever for anything but weapons. The "narrow scope" of the *Terry* exception does not permit a frisk for weapons on less than reasonable belief or suspicion directed at the person to be frisked, even though that person happens to be on premises where an authorized narcotics search is taking place.

*Ybarra,* at 93–94. The court went on:

The initial frisk of Ybarra was simply not supported by a reasonable belief that he was armed and presently dangerous, a belief which this Court has invariably held must form the predicate to a pat down of a person for weapons.

*Ybarra,* at 92–93. *See also State v. Allen,* 93 Wn.2d 170, 606 P.2d 1235 (1980).

In the present case there is express testimony that the officers had no such reasonable belief or suspicion. Hence a frisk of Thompson cannot be sustained in light of *Ybarra.* The majority first quotes material from *Ybarra* irrelevant to the propriety of the frisk, then expeditiously ignores the presence of others on the premises than Broadnax and Thompson, in an apparent effort to shore up the mistaken notion that a frisk is more justifiable when there are only two adults on a private premises than when there are many on a public premises. Aside from being based on wrong facts, this reasoning is fallacious, since as *Ybarra* expressly reaffirmed, a frisk must be based on reasonable subjective fear by the officers. In *Ybarra* the frisk was impermissible when based solely on Ybarra's presence in the tavern. It must follow that a frisk of Thompson here is unjustified when based solely on his presence in a private residence while it is being searched pursuant to a search warrant. The United States Supreme Court's interpretation of the Fourth Amendment is binding upon this court by force of the supremacy clause. *Martin v. Hunter's Lessee,* 14 U.S. (1

Wheat.) 304, 340–41, 4 L. Ed. 97 (1816); *Cooper v. Aaron,* 358 U.S. 1, 17–19, 3 L. Ed. 2d 5, 78 S. Ct. 1401 (1958); *Scruggs v. Rhay,* 70 Wn.2d 755, 760, 425 P.2d 364 (1967).

Even if the patdown were justifiable, which it is not, such patdown must be limited in scope to a determination whether the suspect is armed. As our Supreme Court recently held:

> Assuming the legality of the frisk, the discovery of an unidentified "bulge" in the course of the patdown would entitle the officer to assure himself that it was not a weapon. After satisfying himself the "bulge" was not a weapon, the officer had no valid reason to further invade Allen's right to be free of police intrusion absent reasonable cause to arrest. *See United States v. Thompson,* 597 F.2d 187 (9th Cir. 1979).
>
> . . .
>
> . . . [O]nce it is ascertained that no weapon is involved, the government's limited authority to invade the individual's right to be free of police intrusion is spent. *Terry v. Ohio, supra.*

*State v. Allen, supra* at 172–73.

The mandate of *Ybarra* and the recognition of its holdings by our Supreme Court in *State v. Allen, supra,* is clear: a patdown must be based on a reasonable apprehension for the safety of the officers, and when no weapons are apparent further intrusions are constitutionally impermissible absent probable cause to arrest.

### PROBABLE CAUSE

Again assuming that the patdown or frisk of Thompson for weapons could be considered permissible, the subsequent search of Thompson's left shirt pocket cannot be justified by a probable cause analysis. The majority state that the seizure of the balloon was justified because the officer had recognized the bulge as a balloon containing narcotics. They rely upon cases holding that probable cause to arrest may be based upon the detection of the odor of marijuana. *State v. Hammond,* 24 Wn. App. 596, 603 P.2d 377 (1979); *State v. Huckaby,* 15 Wn. App. 280, 549 P.2d 35

(1976); *State v. Compton,* 13 Wn. App. 863, 538 P.2d 861 (1975). The majority then conclude:

> Logically, there is no difference in power of recognition between use of the tactile rather than the visual sense. An object may be perceived by touch equally as well as by sight.

I have no problem with the well recognized rule that an odor can be sufficiently distinctive to establish probable cause to search and arrest. *Johnson v. United States,* 333 U.S. 10, 92 L. Ed. 436, 68 S. Ct. 367 (1948). Furthermore, the tactile sense can also be sufficiently distinctive to warrant, for example, a search for weapons. *Terry v. Ohio, supra; State v. Brooks,* 3 Wn. App. 769, 479 P.2d 544 (1970). Neither reason nor authority, however, supports the proposition that prior experience with balloons containing heroin is sufficient to warrant a reasonable belief that "[a] small bulge that . . . gives" contains controlled substances. Certainly the extraction of the pack of cigarettes from Ybarra's pocket similarly could not be justified by such "reasonable belief." The officer's observation is ambiguous and totally lacks the distinctive character of the smell of marijuana or the hardness of a weapon.

After today's opinion every patdown for weapons will give rise to probable cause for arrest unless the subject's pockets are empty. This tragic result is destructive of the fundamental guaranties of the Fourth Amendment.

### Basic Principles

There are occasions when reverification of our basic tenets is needed. The framers of our state constitution felt similarly when they wrote "[a] frequent recurrence to fundamental principles is essential to the security of individual right and the perpetuity of free government." Const. art. 1, § 32. When values so basic as those of the Fourth Amendment are being honored only in their breach, it is past the time to consider fundamental principles.

The principle at stake in any Fourth Amendment case is limitation of governmental conduct by rule of law. All governmental authority, whether exercised by legislators, judges, or members of the executive branch must be so limited. The converse of such limitation is unbridled, and too often roughshod, discretion. An early apologist for the rule of law stated:

Government (to define it *de jure,* or according to ancient prudence) is an art whereby a civil society of men is instituted and preserved upon the foundation of common right or interest; or (to follow Aristotle and Livy) it is the empire of laws, and not of men.

And government (to define it *de facto,* or according to modern prudence) is an art whereby some man, or some few men, subject a city or a nation, and rule it according to his or their private interest: which, because the laws in such cases are made according to the interest of a man, or of some few families, may be said to be the empire of men, and not of laws.

J. Harrington, *The Commonwealth of Oceana, 1656,* collected and methodized and reviewed by John Toland, 1777, quoted by A. Mason, *Free Government in the Making* 38 (3d ed. 1965). The principle implicit in Harrington's writing is a fundamental element of our constitutional system. John Marshall wrote "[t]he government of the United States has been emphatically termed a government of laws, and not of men." *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 163, 2 L. Ed. 60 (1803).

A brief history of the Fourth Amendment, which placed in the judiciary the responsibility to develop neutral principles of law to govern intrusions by agents of the government into private spaces of our people, demonstrates that the framers intended it as one of the chief engines within our constitutional mechanism for the effectuation of this principle. Even the Magna Charta contained a provision, chapter 39, aimed at curing the King's practice of arbitrarily seizing the person or property of freemen. 2 J. Lindgard, *History of England* 355–56 (1849). In *Huckle v. Money,* 2 Wils. K.B. 206, 95 Eng. Rep. 768 (1763), Justice Pratt held

that general warrants were illegal, declaring "[t]o enter a man's house by virtue of a nameless warrant, in order to procure evidence, is worse than the Spanish Inquisition; a law under which no Englishman would wish to live an hour." The cases of *Wilkes v. Wood,* 19 How. St. Tr. 1153 (1763) and *Entick v. Carrington,* 19 How. St. Tr. 1029 (1765) moved further toward the requirement for specificity in warrants. Despite these advances in the English law, the American colonies were subjected to writs of assistance, similar to general warrants except of longer duration. One lawyer, James Otis, arguing unsuccessfully against such writs saw them as "the worst instrument of arbitrary power, the most destructive of English liberty and the fundamental principles of law, that ever was found in an English law book," insofar as they placed "the liberty of every man in the hands of every petty officer." 2 *The Works of John Adams* 523–24 (C. Adams ed. 1850); *see also* T. Cooley, *A Treatise on Constitutional Limitations* 301–03 (8th ed. 1927).

Following the revolution several states sought to curb the discretion of searching officers by enacting bills of rights.

Virginia Const. art. 1, § 10 provided:

> That general warrants, whereby an officer or messenger may be commanded to search suspected places without evidence of a fact committed, or to seize any person or persons not named, or whose offence is not particularly described and supported by evidence, are grievous and oppressive, and ought not to be granted.

2 B. Poore, *Federal and State Constitutions* 1909 (1877). At least six other state declarations or bills of rights followed Virginia by including some provisions regarding search and seizure. N. Lasson, *The History and Development of the Fourth Amendment to the United States Constitution* 13–14 (1937). While the Constitution was initially ratified without a bill of rights, recognition of popular sentiment impelled President Washington to refer to the need for amendments in his inaugural address. *10 Writings of George Washington* 385–86 (W.C. Ford ed. 1891). Within

this historical framework the Fourth Amendment was adopted. If there be one lesson deducible from this history, it is that the taproot of the Fourth Amendment reaches down to the very foundation upon which our whole system of free government is based.

Against this historical backdrop we can see in clear focus how "'jealously and carefully drawn'" must be any exceptions to the Fourth Amendment's warrant requirement. *Coolidge v. New Hampshire,* 403 U.S. 443, 455, 29 L. Ed. 2d 564, 91 S. Ct. 2022 (1971). With the Supreme Court's mention of "exigent circumstances" in *Coolidge,* a host of exceptions grew up. As I demonstrated at perhaps too great length in *State v. Thompson,* 24 Wn. App. 321, 327 *et seq.,* 601 P.2d 1284 (1979), the United States Supreme Court is still jealous and careful about exceptions to the Fourth Amendment guaranties. Now *Ybarra* adds further support to that position.

In summary, observance of the Fourth Amendment is fundamental to our whole system of free government. The ringing words of Oliver Wendell Holmes are as relevant today as they were more than 50 years ago: "for my part I think it a less evil that some criminals should escape than that the Government should play an ignoble part." Justice Holmes, dissenting in *Olmstead v. United States,* 277 U.S. 438, 470, 72 L. Ed. 944, 48 S. Ct. 564, 66 A.L.R. 376 (1928). I believe this to be true because

> In a government of laws, existence of the government will be imperilled if it fails to observe the law scrupulously. Our Government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. . . . To declare that in the administration of the criminal law the end justifies the means . . . would bring terrible retribution.

*Olmstead v. United States, supra* at 485 (Justice Brandeis, dissenting). This admonition is true for the police, the exemplars of lawful authority for the common man, but is a compelling verity for judges, since courts have "neither

force nor will, but merely judgment." The Federalist No. 78 (A. Hamilton).

I would suppress the evidence and remand for a new trial.

Reconsideration denied June 19, 1980.

Remanded by Supreme Court to Court of Appeals October 10, 1980.